**Michaela C. FERGUSON, Plaintiff,**

v.

**WAL–MART STORES, INC., a foreign corporation, Defendant.**

**No. CS–99–0178–EFS.**

United States District Court,
E.D. Washington.

Sept. 28, 2000.

---

Stewart R. Smith, Lacy & Kane, PS, East Wenatchee, WA, for Plaintiff.

D. Michael Reilly, Lane, Powell, Spears, Lubersky, Seattle, WA, Linda A. Whittaker, Wal–Mart Stores, Inc., Bentonville, AR, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SHEA, District Judge.

On September 21, 2000, the Court heard oral argument on Defendant's Motion for Summary Judgment Pursuant to Rule 56, (Ct.Rec.22). Plaintiff Michaela C. Ferguson was represented by Stewart R. Smith. Defendant Wal–Mart Stores, Inc. ("Wal–

Mart") was represented by Linda Whittaker. The Court has reviewed Ms. Ferguson's motion, the parties' briefs, and the file, and has considered the arguments of counsel.

## I. BACKGROUND

In September 1994, Ms. Ferguson was hired by Wal–Mart's Wenatchee, Washington store as the Over the Counter Manager for the pharmacy department. She was forty-seven at the time. In the following years, Ms. Ferguson's salary at Wal–Mart increased from $7.00 per hour to $9.00 per hour. In 1996 and 1997, the pharmacy manager, Melissa Brown Sharp, rated Ms. Ferguson's job performance as "above standard."

During the time that both Ms. Ferguson and Ms. Brown Sharp worked at the Wenatchee Wal–Mart, Ms. Brown Sharp allegedly made comments regarding performance and age. When talking about hiring an individual for the pharmacy, Ms. Brown Sharp reportedly said "give me young ones and give me fast ones." (Aff. Shirley Erickson, Ct. Rec. 31, ¶ 3.) When Ms. Ferguson questioned that statement, Ms. Brown Sharp allegedly replied, "Well, you are already here, and you do get your job done." (Decl. Linda Whittaker, Ct. Rec. 25, Dep. Michaela C. Ferguson, Ex. E, at 46 lines 13–14.) Once, when Ms. Ferguson failed to get a job done as fast as Ms. Brown Sharp desired, Ms. Brown Sharp advised that "you need to be faster or we'll have to get somebody younger who can do it." (Id. at 48 lines 17–18.)

In the fall of 1997, Ms. Ferguson began to suffer severe problems with her knee as a result of a condition diagnosed as degenerative or hypertrophic arthritis. By mid-September, she could not perform the essential functions of her job. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J., Ct. Rec. 29, at 12 lines 9–11.) She requested and received a medical leave of absence from September 23, 1997, until January 1998, (Ct. Rec. 25 Ex. D), and underwent total knee replacement surgery on October 27, 1997. Wal–Mart's leave of absence policy provides for twelve weeks of job-protected leave; eligible employees may take leaves longer than twelve weeks but their jobs will not be protected. (Ct. Rec. 25 Ex. H at 11.) Wal–Mart's policy also requires an employee on a medical leave of absence to be fully released by her doctor before returning to work. (Id.) Because Ms. Ferguson's leave began September 23, 1997, she was on protected leave only until December 16, 1997.

During her convalescence, Ms. Ferguson states she kept in contact with Wal–Mart to inform it of her condition. On November 10, 1997, Ms. Brown Sharp told Ms. Ferguson that the District Manager, Michael Peerson, stated that if Ms. Ferguson was not back to work by December 10–16, 1997, she would be replaced. At that time, Ms. Ferguson's doctor allegedly told Ms. Ferguson he would release her only for light or restricted duty with no climbing, bending or stooping—though there is no admissible evidence in the record supporting that the doctor said this. When Ms. Ferguson asked to return to work in a light duty capacity, Ms. Brown Sharp stated that Mr. Peerson required that her doctor release her at 100% of her duties before she could return. Ms. Ferguson asserts that for the activities she could not perform because of the light duty restriction, she, as the Over the Counter Manager, would have had the ability to direct associates to assist her or perform those activities.

About November 16, 1997, Ms. Brown Sharp told Ms. Ferguson that Laura Simpson, a former Wal–Mart employee who was twenty-six years old and who had worked with Ms. Ferguson, would be returning to Wal–Mart after Thanksgiving and taking Ms. Ferguson's position as the Over the Counter Manager. Ms. Simpson states that although it was presented to her that she was the Over the Counter Manager, she personally felt she was only replacing Ms. Ferguson until she was able to return to work. (Aff. Laura Simpson, Ct. Rec. 30, at 2 ¶ 4.) At that same time, Ms. Brown Sharp allegedly told Ms. Fer-

guson that Ms. Ferguson would be contacted regarding her exit interview.

By at least mid December, Ms. Ferguson alleges she was able, with reasonable accommodation, to perform the essential functions of her job. (Ct. Rec. 29 at 12 lines 10–12, 19 lines 22–25.)

Ms. Ferguson's physician released her to return to work on January 8, 1998, without any limitations. Wal–Mart states that at that time there was no 40 hour per week position available that paid $9.00. (Def.'s Statement Material Facts Supp. Summ. J., Ct. Rec. 24, at 5 Def.'s Fact 17.) Ms. Ferguson told Wal–Mart that she needed a 40 hour per week job with a $9.00 per hour salary. (Ct. Rec. 25 Ex. E at 68 lines 11–23.) Wal–Mart extended Ms. Ferguson's medical leave for 30 days to try to find an acceptable position for her. On February 6, 1998, Ms. Ferguson was terminated because there were no jobs available meeting her criteria of 40 hours per week at $9.00 per hour. She was fifty years old.

On March 25, 1998, Ms. Simpson resigned from the Over the Counter Manager position effective April 8, 1998. The position duties were thereafter temporarily assigned to Wal–Mart employee Tanya Dickerson. Ms. Ferguson applied for the job and was interviewed by Ms. Brown Sharp and District Manager Richard Sigley. Ms. Ferguson asserts that Mr. Sigley asked her during the interview, "How can you prove to me that you can do your job and that you've recovered from your surgery?" (Pl.'s Statement Specific Facts Relied Upon Opp'n Def.'s Mot. Summ. J., Ct. Rec. 34, at 4 lines 7–9.) When Ms. Ferguson responded that she was able to perform the job, Mr. Sigley allegedly replied, "Well, I just can't believe that one minute you're disabled and the next minute you're not." (*Id.* at 4 lines 10–11.) Throughout the interview, Mr. Sigley allegedly asked Ms. Ferguson if there was any discomfort in her knee. Mr. Sigley counters that he was not concerned during the interview whether Ms. Ferguson would be able to perform the Over the Counter Manager

functions because she had been fully released by her doctor. (Decl. Kimberly M. Meyers Supp. Def.'s Resp. to Def.'s Mot. Summ. J., Ct. Rec. 43, Dep. Oral Examination Richard Sigley, Ex. A., at 23 lines 2–8.)

After the interview, Ms. Brown Sharp told Mr. Sigley she wanted Ms. Ferguson back. Mr. Sigley felt another candidate was more qualified. (Ct. Rec. 25, Dep. Oral Examination Melissa Brown Sharp, Ex. F., at 29 lines 23–24.) He thought Ms. Ferguson had been a little arrogant during the interview: she had indicated that she was looking into possible litigation if she didn't get her job back. (Ct. Rec. 25 Dep. Oral Examination Richard Sigley, Ex. S, at 19 lines 19–25 and 20 lines 1–9.) Nonetheless, Mr. Sigley allegedly told Ms. Brown Sharp that she could offer the position to Ms. Ferguson but it would be under scrutiny. (Ct. Rec. 25 Ex. F. at 30 lines 1–6.) As Ms. Brown Sharp explained, "Basically, the department would be gone over with a fine tooth comb every time anybody was in.... we would have to be up to par and then some all the time." (Ct. Rec. 25 Ex. F at 30 lines 3–6.) Mr. Sigley denies stating that the department would be under closer scrutiny if Ms. Ferguson, as opposed to someone else, were hired. (Aff. Stewart R. Smith Opp'n Def.'s Mot. Summ. J., Ct. Rec. 33, Dep. Oral Examination Richard Sigley, Ex. L, at 22–23.)

Ms. Brown Sharp contacted Ms. Ferguson and told her she could come back but that "[t]hey would be like nitpicky all the time on us, and ... unfortunately, that [you] would have to start over again.... [You] wouldn't be just replaced back into [your] position at [your] pay rate. [You] would just be liked a new hire basically." (Ct. Rec. 25 Ex. F at 30 lines 7–13). Ms. Ferguson refused to take the position under those conditions.

On April 18, 1998, Ms. Dickerson was hired for the position and became the new Over the Counter Manager. A woman younger than Ms. Ferguson, Ms. Dickerson had had only "standard" overall rat-

ings before she was interviewed for the position, though Mr. Sigley stated that existing store employees could not apply for a transfer within the store if they didn't have an above-standard evaluation. (Ct. Rec. 33 Ex. L at 21 lines 15–19.) Ms. Dickerson's only prior managerial experience had been as a night desk manager at a bowling alley.

## II. PROCEDURAL HISTORY

On September 24, 1998, Ms. Ferguson mailed to the Equal Employment Opportunity Commission ("EEOC") an Intake Questionnaire alleging (1) failure to accommodate in November 1997, in violation of the ADA, and (2) termination in February 1998 and denial of rehire in March 1998 due to age and disability, in violation of the Discrimination in Employment Act ("ADEA") and Americans with Disabilities Act ("ADA"). The EEOC received the questionnaire on September 28, 1998, the 300th day after December 2, 1997. Ms. Ferguson signed a formal charge of discrimination on December 4, 1998, and received from the EEOC a Notice of Right-to-Sue.

Ms. Ferguson filed this suit on June 18, 1999. In her Complaint, (Ct.Rec.1), she alleges the following six causes of action against Wal–Mart: (1) age discrimination in violation of the ADEA, 42 U.S.C. § 623; (2) disability discrimination in violation of the ADA, 42 U.S.C. § 12112; (3) violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2614; (4) violation of Washington State's Law Against Discrimination's ("WLAD's") age discrimination provision, Wash. Rev.Code. § 49.60.180; (5) violation of WLAD's handicap discrimination provision, Wash. Rev. Code. § 49.60.180; and (6) wrongful discharge in violation of public policy.

## III. DEFENDANT'S SUMMARY JUDGMENT MOTION

Defendant Wal–Mart moves for summary judgment on Ms. Ferguson's complaint.

### A. The Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." Fed.R.Civ.P. 56(c). The moving party has an initial burden of showing that there is no genuine issue of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the non-moving party will bear the burden of proving the material issue at trial, he must respond by going beyond the pleadings and must by his own affidavits, depositions, answers to interrogatories, and admissions on file identify facts sufficient to establish the existence of a genuine issue. *See id.* at 322, 324, 106 S.Ct. 2548. A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50, 106 S.Ct. 2505. It is not the court's function at the summary judgment stage to determine credibility or decide the truth of the matter. *See id.* at 249, 255, 106 S.Ct. 2505. Rather, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505.

### B. Age Discrimination Claims under ADEA and WLAD

Ms. Ferguson asserts that Wal–Mart violated the ADEA, 42 U.S.C. § 623, and WLAD, Wash. Rev.Code § 49.60.180, by (1) replacing Ms. Ferguson during her

medical leave with Ms. Simpson, a younger employee, thereby discharging Ms. Ferguson, and (2) hiring Ms. Dickerson, a younger person, for the Over the Counter Manager job despite Ferguson's superior qualifications, thereby refusing to hire Ms. Ferguson because of her age.

### 1. Replacement and Discharge under ADEA and WLAD

#### (a) Applicable Law

Both the ADEA and WLAD prohibit employers from discharging a protected individual because of her age. The ADEA provides that "[i]t shall be unlawful for an employer ... to discharge any individual ... because of such individual's age." 29 U.S.C.A. § 623(a)(1) (West 1999). The WLAD provides that "[i]t is an unfair practice for any employer .... [t]o discharge or bar any person from employment because of age." Wash. Rev.Code Ann. § 49.60.180(2) (West Supp.2000).

■ A plaintiff can establish a prima facie discrimination case under the ADEA and WLAD for age-related discharge by showing that (1) she was 40 to 70 years old; (2) she was doing satisfactory work; (3) she was discharged; and (4) she was replaced by a sufficiently younger employee with equal or inferior qualifications. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 891 (9th Cir.1994); *Douchette v. Bethel School Dist. No. 403*, 117 Wash.2d 805, 813, 818 P.2d 1362 (1991); *Grimwood v. University of Puget Sound, Inc.*, 110 Wash.2d 355, 362, 753 P.2d 517 (1988). Once the plaintiff has made out a prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the termination. *See Wallis*, 26 F.3d at 889, 892; *Grimwood*, 110 Wash.2d at 363–64, 753 P.2d 517. Then, to prevail, the plaintiff must show by a preponderance of the evidence that the employer's articulated reasons are a mere pretext for what, in fact, is a discriminatory purpose. *See Reeves v. Sanderson Plumbing Prods. Inc.*, —— U.S. ——, ——, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000); *Wallis*, 26 F.3d at 889, 892; *Grimwood*, 110 Wash.2d at 364, 753 P.2d 517.

#### (b) Discussion

■ Wal–Mart asserts Ms. Ferguson has failed to make out a prima facie case because she failed to show that she was discharged when Ms. Simpson replaced her while she was out on medical leave. The Court finds that the late November hiring of Ms. Simpson was not a "discharge" of Ms. Ferguson.

First, a "discharge" is inconsistent with the reality that upon her return to work on January 8, 1998, Ms. Ferguson had the option of taking other jobs for which she was qualified, though at reduced pay or fewer hours because no jobs having the same pay and hours were available. When she refused lower paying less than full time jobs, Wal–Mart, pursuant to its policy, (Ct. Rec. 25 Ex. H at 11), extended her medical leave for another 30 days in order to find her an acceptable position. It was only when no acceptable position had been found by February 8, 1998, that Wal–Mart terminated Ms. Ferguson.

Second, in hiring Ms. Simpson, Wal–Mart was not discharging Ms. Ferguson but filling a position that had been vacant for almost two months and that, based on the following facts and reasonable inferences therefrom, would be vacant at least for another month: Ms. Ferguson originally requested a 14 week leave ending January 1998; the Wal–Mart policy clearly states that employees on medical leave longer than 12 weeks are not guaranteed their pre-leave position but may be offered any open position for which they are qualified; in November 1997, Ms. Ferguson, concerned about returning to work before the expiration of the job protection period, allegedly informed Ms. Brown Sharp that she could return to work on light duty; because light duty positions at Wal–Mart are limited, Ms. Ferguson was required to continue on medical leave until she was fully recovered or 100%, (*Id.*); Wal–Mart's policy required a medical release from Ms.

Ferguson's health care provider stating that she was able to return to work, (*Id.*), *see also* 29 U.S.C. § 2614(4); 29 C.F.R. § 825.310(a), (f) (stating that an employer may require a fitness-for-duty certification before restoring the employee to employment); for Ms. Ferguson to have returned to work by December 16, 1997, the date her 12-week job protection period ended, she needed to have contacted Ms. Brown Sharp no later than December 2, 1997, told her she was ready to return to work, and provided a release from her doctor stating she was able to return to work, (Ct. Rec. 25 Ex. H at 11); and Ms. Ferguson did not provide Wal-Mart with a release to return to work until January 6, 1998. These facts do not demonstrate that Wal-Mart discharged Ms. Ferguson by replacing her with Ms. Simpson while she was out on medical leave. Further, Ms. Ferguson cites no case which holds that action by an employer while the claimant is on medical leave is a "discharge" for purposes of an ADEA or WLAD age discrimination claim.

Accordingly, Ms. Ferguson has not made out a prima facie case for age discrimination.

■ However, even if the Court were to find that Ms. Ferguson's evidence is significantly probative on the existence of discharge, Wal-Mart offers up as a legitimate, nondiscriminatory reason for any discharge the fact it needed someone to perform Ms. Ferguson's job in her absence. The same facts recited above demonstrate there is no genuine issue of material fact whether Wal-Mart's reason was a pretext for age discrimination. Wal-Mart had established policies regarding job-protected medical leave, light duty, releases to return to work, and obligations to assist in finding a job for an employee for thirty days after she returns to work. Wal-Mart applied those policies, to the letter, to Ms. Ferguson. Further, the remarks attributed to Ms. Brown Sharp preferring younger and faster workers and warning Ms. Ferguson to work faster or Wal-Mart would have to get someone younger to do the job have no demonstrated nexus to the events occurring between November 1997 and February 8, 1998. Such unrelated remarks are insufficient to establish discrimination. *See Nesbit v. Pepsico, Inc.,* 994 F.2d 703, 705 (9th Cir.1993) (comment a supervisor made to plaintiff-employee during a meeting that "[w]e don't necessarily like grey hair," and comment the senior vice president made during an interview with a writer that "[w]e don't want unpromotable fifty-year olds around" were not tied or related to plaintiff's termination and were therefore at best weak circumstantial evidence of discriminatory animus toward plaintiff); *Kuyper v. State,* 79 Wash.App. 732, 737-739, 904 P.2d 793 (1995) (statement supervisor made after plaintiff filed her lawsuit against the employer for failing to promote plaintiff that plaintiff "should just retire" did not prove pretext because there was no nexus between the statement and the failure to promote). Finally, any significance that might be attributed to those statements in the context of Wal-Mart's alleged discharge of Ms. Ferguson is undermined by the fact Ms. Ferguson was forty-seven years old when she was hired by Wal-Mart in 1994, Ms. Brown Sharp gave Ms. Ferguson positive evaluations, and Ms. Brown Sharp ultimately offered Ms. Ferguson the Over the Counter Manager job.

Because Ms. Ferguson fails to assert sufficiently probative evidence of discharge to make out a prima facie case, and because there is insufficient evidence to create a genuine issue of material fact concerning whether Wal-Mart's reason for retaining Ms. Simpson was a pretext for age discrimination, Wal-Mart's motion for summary judgment on the issue of whether it violated the ADEA and the age discrimination portion of WLAD by replacing Ms. Ferguson with Ms. Simpson, a younger employee, is GRANTED.

### 2. Failure to Hire under ADEA and WLAD

#### (a) Applicable Law

Both the ADEA and WLAD prohibit employers from refusing to hire a protect-

ed individual because of her age. The ADEA provides that it shall be unlawful for an employer to refuse to hire any individual because of her age. *See* 29 U.S.C. § 623(a)(1). The WLAD provides that "[i]t is an unfair practice for any employer ... [t]o refuse to hire any person because of age." Wash. Rev.Code Ann. § 49.60.180(1) (West Supp.2000).

█ A plaintiff can establish a prima facie discrimination case under the ADEA and WLAD for failure to hire because of age by showing that (1) she was 40 to 70 years old; (2) she applied for and was qualified for a position for which the employer sought applicants; (3) she was rejected by the employer; and (4) the employer hired a younger employee for the position. *See E.E.O.C. v. Insurance Co. of North Am.*, 49 F.3d 1418 n. 1 (9th Cir. 1995); *Kuyper*, 79 Wash.App. at 735, 904 P.2d 793. As for an age-related discharge case, once the plaintiff has made out a prima facie "failure to hire" case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the termination. *See Wallis*, 26 F.3d at 889, 892; *Grimwood*, 110 Wash.2d at 363–64, 753 P.2d 517. Then, to prevail, the plaintiff must show by a preponderance of the evidence that the employer's articulated reasons are a mere pretext for what, in fact, is a discriminatory purpose. *See Reeves,* —— U.S. at ——, 120 S.Ct. at 2106; *Wallis,* 26 F.3d at 889, 892; *Grimwood,* 110 Wash.2d at 364, 753 P.2d 517.

### (b) Discussion

█ Here again, Wal–Mart asserts Ms. Ferguson has failed to make out a prima facie case because she was in fact not rejected by Wal–Mart. It is undisputed that Ms. Ferguson was offered the job of Over the Counter Manager. However, Ms. Ferguson essentially asserts that she was not offered the same job that Ms. Dickerson, a younger woman, was offered because Ms. Ferguson's job was accompanied by close scrutiny—and, by inference, the job Ms. Dickerson received was not. The record lacks significantly probative evidence that Ms. Ferguson and Ms. Dicker-

son were in fact not offered the same job. Ms. Ferguson has therefore failed to identify facts sufficient to support a prima facie case that Wal–Mart refused to hire her on the basis of her age in violation of the ADEA and WLAD.

Even if the Court were to find that statements Ms. Brown Sharp made when offering the job to Ms. Ferguson are significantly probative on the issue of whether Ms. Ferguson was offered the same job that Ms. Dickerson was offered, Wal–Mart offers up as a legitimate, nondiscriminatory reason for offering the job to Ms. Dickerson that she was the better person for the job. The only evidence Ms. Ferguson offers to support her assertions that Wal–Mart's reason was a pretext for age discrimination is Ms. Brown Sharp's "younger and faster" and "getting someone younger to do the job" remarks. However, these remarks, as discussed previously, have no demonstrated connection to Wal–Mart's alleged failure to offer Ms. Ferguson the same job that Ms. Dickerson was offered. *See Nesbit,* 994 F.2d at 705; *Kuyper,* 79 Wash.App. at 737–739, 904 P.2d 793. Further, the facts surrounding the interview and the reasonable inferences therefrom suggest Wal–Mart would not have been motivated by discrimination: Wal–Mart knew she was over forty years old but nonetheless notified her of the interview for the Over the Counter Manager position, even though Wal–Mart had no further obligation to her as she had already been terminated by that time; and there were no statements or questions during the interview that directly or by reasonable inference implied Ms. Ferguson's age. Accordingly, there is insufficient evidence to create a genuine issue of material fact whether that Wal–Mart's reason for offering Ms. Dickerson the job is a pretext for age discrimination.

Because Ms. Ferguson fails to assert sufficiently probative evidence that Wal–Mart rejected her for or failed to offer the Over the Counter Manager job offered to Ms. Dickerson such that she has made out

a prima facie case, and because there is insufficient evidence to create a genuine issue of material fact concerning whether Wal–Mart's reason for offering Ms. Dickerson the job was a pretext for age discrimination, Wal–Mart's motion for summary judgment on the issue of whether it violated the ADEA and the age discrimination portion of WLAD by hiring Ms. Dickerson instead of Ms. Ferguson is GRANTED.

## C. Disability Discrimination Claims under ADA and WLAD

Ms. Ferguson asserts that Wal–Mart violated the ADA, 42 U.S.C. § 12112, and WLAD, Wash. Rev.Code § 49.60.180, because (1) Wal–Mart was able to offer or provide reasonable accommodation to Ms. Ferguson beginning in about November 1997 but declined to do so despite Ms. Ferguson's request, and consequently discharged Ms. Ferguson from her employment, and (2) Wal–Mart refused to hire Ms. Ferguson in April 1998 because of her disability.

### 1. ADA Exhaustion Requirement

Wal–Mart asserts that Ms. Ferguson failed to exhaust her administrative remedies with respect to her ADA "failure to accommodate" claim and that the claim is therefore barred. At the hearing, the parties agreed that in order to exhaust her administrative remedies under ADA, Ms. Ferguson was required to file an ADA charge with the EEOC within 300 days of the alleged disability-based discriminatory act. An Intake Questionnaire submitted to the EEOC that is "sufficiently precise to identify the parties, and to describe generally the action or practices complained of," though not a charge, will suffice as a charge. See Casavantes v. California State Univ., 732 F.2d 1441, 1443 (9th Cir.1984). Here, the EEOC received Ms. Ferguson's Intake Questionnaire on September 28, 1998. The Intake Questionnaire included a single-spaced typed sheet setting forth the dates, events and parties related to her claim. (Ct. Rec. 33 Ex. B. at 7). The Court finds that the information included in the Ms. Ferguson's

questionnaire is sufficient for it to constitute a charge. Ms. Ferguson may therefore bring claims regarding events occurring on or after December 2, 1997, the 300th day before September 28, 1998.

Under the continuing violation doctrine, if there is a series of related acts against a single individual that are related closely enough to constitute a continuing violation, and one or more of those acts falls within the limitations period, the related acts are not time barred. See Green v. Los Angeles County Superintendent of Schs., 883 F.2d 1472, 1480–81 (9th Cir. 1989). Ms. Ferguson's "failure to accommodate" claim concerns actions of Wal–Mart that began in November 1997 and extended into January 1998 and that related to Ms. Ferguson's need for accommodation arising from her knee surgery. The Court finds that Wal–Mart's alleged failure to accommodate during this period constitutes a series of related acts that constitute a continuing violation. Since the part of this violation occurring on or after December 2, 1997, falls within the 300 days statute of limitations, the entire alleged "failure to accommodate," beginning in November 1997, falls within the limitations period and is not barred.

### 2. Applicability of the ADA and WLAD

Wal–Mart asserts that neither the ADA nor WLAD apply to Ms. Ferguson because she is not disabled or handicapped within the meaning of those statutes.

### (a) Existence of a Disability under the ADA

The ADA provides that no employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a) (West 1995). A "disability" is "(A) a physical or mental impairment that substantially limits one or more of the

major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (West 1995). A "physical impairment" includes a physiological disorder, condition, or anatomical loss that affects the musculoskeletal body system. *See* 29 C.F.R. § 1630.2(h)(1) (2000). "Major life activities" include functions such as performing manual tasks, walking and working. *See* 29 C.F.R. § 1630.2(i) (2000). In the context of working, "substantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i) (2000). The factors that may be considered in determining whether an individual is substantially limited in the major life activity of "working" include (1) the nature and severity of the impairment; (2) the duration of the impairment; (3) the impairment's permanent or long term impact; (4) the geographical area to which the individual has reasonable access; (5) the job from which the individual was disqualified because of the impairment, and the number and types of jobs in that class and geographical area from which the individual is also disqualified; and (6) the number and types of jobs outside that job class but within the geographical area from which the individual is also disqualified because of the impairment. *See* 29 C.F.R. § 1630.2(j)(3)(ii) (2000).

While intermittent, episodic impairments, such as a broken leg, are not disabilities, "an intermittent impairment that is a characteristic manifestation of an admitted disability is . . . a part of the underlying disability and hence a condition that the employer must reasonably accommodate." *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 544 (7th Cir.1995). "Often the disabling aspect of a disability is, precisely, an intermittent manifestation

of the disability, rather than the underlying impairment." *Id.*

 Ms. Ferguson was diagnosed with degenerative or hypertrophic arthritis which she defines as "chronic arthritis characterized by an overgrowth of bone, degeneration and overgrowth of cartilage, and thickening of membranes which line the surfaces of the bones." (Ct. Rec. 29 at 9 lines 15–21, citing J.E. Schmidt, M.D., Attorney's Dictionary of Medicine, A–334, H–126 (1986).) Assuming this to be true, as it must in a summary judgment motion, the Court finds Ms. Ferguson at least had a physical impairment. Because the impairment was severe enough that (1) by mid-September 1997 Ms. Ferguson could not perform the essential functions of her job, (2) Ms. Ferguson requested a medical leave from September 23, 1997, until January 1998, (3) Ms. Ferguson underwent total knee replacement surgery on October 27, 1997, and (4) it was not known whether Ms. Ferguson's condition could be successfully repaired by surgery, the Court finds that, as a matter of law, Ms. Ferguson had a physical impairment that substantially limited at least Ms. Ferguson's major life activity of work. Therefore, as of September 23, 1997, the date she left work, Ms. Ferguson was disabled within the meaning of the ADA. A person who has a major surgical procedure in an effort to cure a disability under the ADA continues to be characterized as having a disability until, if ever, she receives a medical release. In this case, Ms. Ferguson continued to be disabled until she received a medical release permitting her to return to her job and resume its essential duties. Accordingly, Ms. Ferguson was disabled within the meaning of the ADA from September 23, 1997, to January 8, 1998.

 The issue remains whether Ms. Ferguson was disabled within the meaning of the ADA at the time of her interview in 1998. Neither party has provided evidence regarding whether Ms. Ferguson still had or continues to have any impairment since January 8, 1998. Further, nei-

ther party has provided evidence regarding the severity and anticipated duration and long term impact of any subsequent or ongoing impairment. Accordingly, Ms. Ferguson has not met her burden of showing she actually suffered a disability at the time of her interview in 1998. Nonetheless, a "disability" under the ADA includes being regarded as having an impairment. Ms. Ferguson has provided sufficient evidence, by way of Mr. Peerson's questions and statements during the interview, to raise a genuine issue of material fact concerning whether Mr. Peerson regarded Ms. Ferguson as having a disability. The Court therefore assumes *arguendo* that Ms. Ferguson was disabled within the meaning of the ADA at the time of her interview in 1998.

### (b) Existence of a Physical Handicap under the WLAD

The WLAD provides that "[i]t is an unfair practice for any employer ... to discriminate against any person ... because of ... the presence of any sensory, mental, or physical handicap." Wash. Rev. Code Ann. § 49.60.180(3) (West Supp. 2000). The "presence of a physical handicap" includes, but is not limited to, "where a physical condition (i) is medically cognizable or diagnosable; (ii) exists as a record or history; or (iii) is perceived to exist, whether or not it exists in fact." *Id.* at 906–07 (quoting Wash. Admin. Code § 162–22–040(1)(b)).

▮ The Court finds that, as a matter of law, the degenerative arthritis in Ms. Ferguson's knee was a present physical handicap from September 23, 1997, to January 8, 1999, because it was a medically diagnosed physical condition that prevented her from keeping her job. Accordingly, Ms. Ferguson suffered from a physical handicap within the meaning of the WLAD from September 23, 1997, to January 8, 1998.

The Court also finds that, as a matter of law, that Ms. Ferguson had a physical handicap within the meaning of WLAD at the time of her interview in 1998 because

having an artificial knee is a medically cognizable condition.

### 3. Failure to Provide Reasonable Accommodation Resulting in Discharge

The ADA and WLAD both require an employer to make reasonable accommodations to an employee's disability or physical handicap unless the employer can demonstrate that the accommodation would impose an undue hardship on its business. *See* 42 U.S.C. § 12112(a), (b)(5)(A); *Doe v. Boeing Co.,* 121 Wash.2d 8, 17–18, 846 P.2d 531 (1993); Wash. Admin. Code § 162–22–075.

### (a) Applicable Law

▮ To establish a claim under the WLAD based on an employer's failure to make reasonable accommodation, the plaintiff must show (1) she has a disability; (2) she can perform the essential functions of the job, with or without reasonable accommodation; and (3) she was not reasonably accommodated. *See Easley v. Sea–Land Serv. Inc.,* 99 Wash.App. 459, 468, 994 P.2d 271 (2000). To prevail on an employment termination claim under the ADA, a plaintiff must establish (1) that she is disabled within the meaning of the ADA; (2) that with or without reasonable accommodation she is qualified to perform the essential functions of the job she holds; and (3) that she suffered adverse employment action because of her disability. *See Braunling v. Countrywide Home Loans Inc.,* 220 F.3d 1154, 1156 (9th Cir.2000).

▮ The duty of an employer to reasonably accommodate an employee's handicap does not arise until the employee gives the employer notice of her disability. *See Goodman v. Boeing Co.,* 127 Wash.2d 401, 408–09, 899 P.2d 1265 (1995); *Smith v. Midland Brake, Inc.,* 180 F.3d 1154, 1171–72 (10th Cir.1999) (the interactive process envisioned by ADA's reasonable accommodation requirement ordinarily begins with "the employee providing notice to the employer of the employee's disability and any resulting limitations"). "This

notice then triggers the employer's burden to take 'positive steps' to accommodate the employee's limitations." *Goodman,* 127 Wash.2d at 408, 899 P.2d 1265; *see also Smith,* 180 F.3d at 1172 (noting that the employer's responsibilities are triggered by appropriate notice by the employee). Reasonable accommodation "envisions an exchange between employer and employee where each seeks and shares information to achieve the best match between the employee's capabilities and available positions." *Goodman,* 127 Wash.2d at 408–09, 899 P.2d 1265; *see also Smith,* 180 F.3d at 1172 (stating that the obligation of the parties to proceed in a reasonably interactive manner "is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee").

Wal–Mart cites *Willis v. Pacific Maritime Ass'n,* 162 F.3d 561, 565 (9th Cir. 1998) (quoting *Barnett v. United States Air, Inc.,* 157 F.3d 744, 748–49 (9th Cir. 1998)), for the proposition that "[w]here the ADA claim is based on an employer's alleged refusal to make a reasonable accommodation, the plaintiff bears the burden of producing evidence that 'a specific, reasonable accommodation was available to the defendant at the time plaintiff's limitations became known.'" However, *Barnett* was superseded and then vacated. *See* 196 F.3d 979 (9th Cir.1999); 201 F.3d 1256 (9th Cir.2000). The Court therefore declines to rely on that proposition.

#### (b) Discussion

■ The Court holds that, under the ADA and the WLAD, when an employee seeks to return to work following a medical leave of absence necessitated by the onset of a disability (ADA) or a handicap (WLAD) which prevents her from carrying out the essential functions of her job, her employer's duty to reasonably accommodate her—including its duty to engage in a dialogue regarding reasonable accommodation—is triggered at the time the employee provides her employer with a release from her medical health care professional which essentially states that the employee has the ability to perform the essential functions of her job with reasonable accommodation. The release may be as simple as a "return to work" slip containing some restrictions signed by a medical health care professional. This would trigger the duty to engage in the reasonable accommodation dialogue without compelling a result or an agreement. Both the employee and employer would continue to have the rights and protections provided by both the ADA and the WLAD in the dialogue involving whether the employee can now perform the essential functions of her job with reasonable accommodations which do not impose an undue hardship on the employer. *See* 42 U.S.C. § 12112(a), (b)(5)(A); *Doe,* 121 Wash.2d at 17–18, 846 P.2d 531; Wash. Admin. Code § 162–22–075.

■ Here, it is undisputed that Ms. Ferguson did not provide Wal–Mart with any type of release from her doctor until January 1998. Accordingly, Wal–Mart had no ADA or WLAD obligation to engage in a dialogue regarding reasonable accommodations with Ms. Ferguson. Because the release contained no restrictions, Wal–Mart did not need to provide or to discuss providing reasonable accommodations to Ms. Ferguson upon her return. In fact, there is no evidence that Ms. Ferguson was disabled or thought of herself as disabled at that point—or at any point thereafter. Wal–Mart therefore did not fail to provide reasonable accommodations to Ms. Ferguson because the obligation to do so had not arisen. Wal–Mart's motion for summary judgment on the issue of whether it failed under the ADA and the WLAD to reasonably accommodate Ms. Ferguson is GRANTED.

#### 4. Refusal to Hire

The ADA provides that no employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring ... of employees, employee compensation, and other terms, conditions, and privileges of employment." 42

U.S.C.A. § 12112(a) (West 1995). The WLAD generally provides that it is an unfair practice for any employer to refuse to hire a person because of the presence of a physical handicap. *See* Wash. Rev.Code. Ann. § 49.60.180(2) (West Supp.2000). It is also an unfair practice under the WLAD for an employer "[t]o discriminate against any person in compensation or in other terms or conditions of employment because of ... the presence of any sensory, mental or physical handicap." Wash. Rev. Code. Ann. § 49.60.180(3) (West Supp. 2000).

■■■ Pointing to Ms. Brown Sharp's comments that there would be heightened scrutiny of her job performance if she accepted the offer of employment, Ms. Ferguson asserts that the job offer was a "sham." However, Wal–Mart did offer her the job which she rejected; therefore, Wal–Mart did not fail to hire her in violation of the ADA or the WLAD. An alternative reading of Ms. Ferguson's complaint is that Wal–Mart had offered her a job with different terms and conditions from Ms. Dickerson's job because Ms. Ferguson's job was accompanied by heightened scrutiny—and, by inference, the job Ms. Dickerson received was not. However, as was discussed under Ms. Ferguson's age discrimination claims, the record lacks significantly probative evidence that Ms. Ferguson and Ms. Dickerson were in fact offered jobs with different terms and conditions. Ms. Ferguson has therefore failed to identify facts sufficient to support a prima facie case that Wal–Mart discriminated against her in the terms and conditions of employment on the basis of disability, in violation of the ADA and WLAD.

Accordingly, Wal–Mart's motion for summary judgment on the issue of whether it violated the ADA and the disability portion of WLAD by hiring Ms. Dickerson instead of Ms. Ferguson is GRANTED.

### D. Family and Medical Leave Act Claim

In her complaint, Ms. Ferguson includes a claim for violation of the FMLA, 29 U.S.C. § 2614. She concedes in her response brief that this claim is not actionable. Accordingly, Wal–Mart's motion for summary judgment on this claim is GRANTED.

### E. Wrongful Discharge Claim

In her complaint, Ms. Ferguson claims that Wal–Mart terminated her in violation of public policy. She concedes in her response brief that this claim is not actionable. Accordingly, Wal–Mart's motion for summary judgment on this claim is GRANTED.

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment Pursuant to Rule 56, (**Ct.Rec.22**), is **GRANTED**.

**IT IS SO ORDERED.** The District Court Executive is directed to

(A) Enter this Order;

(B) Provide copies to counsel;

(C) **Prepare and enter JUDGMENT accordingly;** and

(D) **CLOSE THIS FILE.**